HOOVER *v.* DETROIT, GRAND HAVEN & MILWAUKEE
RAILWAY CO.

1. NEW TRIAL—APPEAL AND ERROR—RAILROADS—NEWLY DISCOVERED EVIDENCE.

Where plaintiff's motion for a new trial, in an action for the negligent killing of a child who wandered onto a railroad track at or about the crossing of an alley, and within the limits of defendant's yard, presented the newly found testimony of a person living near the scene of the accident who saw decedent and another infant slowly approaching the tracks and last observed them when they were several feet south of the same, and a minute or less afterwards heard the sound of the train stopping, as bearing on the time within which the engineer might have seen the infants if he had been on the lookout, and where her testimony was merely cumulative, with other proofs offered at the trial on the same point, the court did not err in refusing to grant the application, as the evidence might have been obtained, with the exercise of reasonable diligence, for the first trial; also because the testimony was cumulative and not likely to change the result, which was a judgment and verdict for defendant by direction of the court.

2. RAILROADS — NEGLIGENCE — RIGHT OF WAY — YARDS — FENCES — TRESPASSERS.

In this State the rule is well settled that railroads are not

required to fence their yard limits, nor is failure so to do evidence of negligence.

3. SAME—ALLEYS—CROSSINGS—PRESUMPTIONS.

It will not be presumed, from an implied license to cross a railroad track at an alley, that helpless infants, too young to understand danger, will be suffered by those that are responsible for them to wander along or upon the railroad right of way upon which numerous trains are accustomed to pass.

4. INFANTS—CONTRIBUTORY NEGLIGENCE—TRESPASS.

Infants, too young to be conscious of the nature of their acts, or danger therefrom, are not chargeable with contributory negligence or with intentional trespass such as to bar recovery for negligent or reckless conduct of others.

5. RAILROADS—INFANTS—NEGLIGENCE—DUE CARE.

Where there is reason to anticipate that persons or children may be met with on the tracks, especially in cities or towns, trains cannot be operated on the assumption that the track will be clear, and need not be watched, but a proper lookout must be maintained with that degree of care which a person of ordinary caution, having in mind both the safety of the train with its passengers and persons ahead likely to be injured by it, would commonly exercise under like circumstances, according to the probability of danger at the portion of the track being traversed.

6. SAME.

Those who have no relations with infants, such as parent and child, teacher and pupil, or master and apprentice, from which special duties or obligations arise, are not liable for acts done in carrying on the business in which they may be engaged beyond the liability that would attach to negligence towards other classes of persons, not guilty of contributory negligence.

7. SAME—EVIDENCE.

Where two infants were struck by defendant's passenger train, in a city where an alley crossed the right of way, and the evidence showed that no person was in sight when the engine turned the nearest curve to the place of the accident, and the engineer testified that he was watching ahead, and that he made every effort to stop when he did discover them, about 150 or 200 feet ahead of the train,

which was running 18 or 20 miles an hour, and it appeared
that it could not be checked by using the emergency brake
in less than 300 feet or upwards, that the defendant had
often warned trespassers off its right of way at this point,
had at one time fenced it, being within the yards, and
had not acquiesced in the use of the tracks by the public,
the trial court did not err in directing a verdict for the
defendant railroad.

8. Same.

And upon proofs tending to show that the infants went
upon the track not over 200 feet in advance of the train,
too near for it to be stopped without hitting them, that
the engineer could not have stopped his train in time
even if he had seen them sooner, evidence of actionable or
culpable negligence was insufficient to charge defendant
with liability for the death of one of the children.

Error to Kent; McDonald, J. Submitted April 8,
1915. (Docket No. 25.) Decided September 29, 1915.

Case by Harry H. Hoover, as administrator of the
estate of George L. Hoover, deceased, against the De-
troit, Grand Haven & Milwaukee Railway Company
for the unlawful killing of plaintiff's intestate. Judg-
ment for defendant on a directed verdict. Plaintiff
brings error. Affirmed.

*Lombard, Hext & Washburn,* for appellant.

*Harrison Geer* (*W. K. Williams,* of counsel), for
appellee.

Steere, J. Plaintiff brought this action as admin-
istrator of his infant son, George L. Hoover, who, on
June 18, 1912, wandered from his home upon defend-
ant's track and was struck by a passing train, receiv-
ing injuries of which he died the following day. He
was then 25 months of age.

The accident occurred about a mile east of the Plain-
field Avenue station, in the city of Grand Rapids, near
the east line of an alley which runs north and south

just west of and parallel with Benson street, upon which his parents resided, in the sixth house south of the track, on the west side. On leaving the station the railroad track bears southeasterly, curving nearly to the east, where it passes under what is known as College avenue bridge, and from there runs straight to and beyond the place of the accident, which is 936 feet east from the bridge. On the north side of this portion of the track lies Highland Park, a public park of the city. Grand avenue crosses the railroad upwards of 1,400 feet east of College avenue. No streets cross the track between the two. Benson street extends south from the railroad right of way 508 feet west of Grand avenue. Two other north and south streets, Union and Brainard, also extend south from the right of way between Benson and the bridge. The open park extends along the north side of the railroad westerly from Grand avenue to beyond the north end of the alley mentioned, nearly opposite the end of which deceased was struck by the regular east-bound passenger train of defendant which had left the station at 4:52 p. m. At that point the track passes through a cut with banks about 25 feet high on each side; the roadbed being raised by grading so that the rails and ties are about a foot above the general level.

It is conclusively shown, and undisputed, that when the train reached the College avenue bridge, and until it had proceeded a considerable distance east of there, the track was clear. Deceased was struck by the train just as, or after, he came upon the track from the side, accompanied by another small child of about the same age. The fireman was down on the deck of the engine at his fires as the train approached this point. The engineer was in his seat on the right side of the cab, watching the track ahead through the front window provided for that purpose. His view along the line of the track from the bridge beyond the place of the

accident was clear.  He testified that he was on time, that just before he went under the bridge he sounded a signal, that the engine bell was ringing, and he was in his seat maintaining a lookout from the bridge to the place of the accident, that, if he was not looking straight ahead all the time, "I would not be an instant, it would not be but a second or two, to glance over my cab to see what was going on."  Of the accident he testifies that the first thing which attracted his attention was when he "saw the children coming on the track and when they were crossing the track, from 150 to 200 feet in front of the engine."  He also said:

"One was on the outside of the rail and one inside the rail.  *  *  *  The very moment I first saw them they were right on the middle of the track.  *  *  * The second I saw them I slapped the brakes in emergency and throwed my engine off.  *  *  *  I could not have done anything more than I did to stop the train."

The train consisted of the engine, a baggage car, a mail and express car combined, and two passenger coaches.  It was 220 feet long, running at 18 or 20 miles an hour, and could be stopped by using the emergency in from 300 to 400 feet.  It ran a distance of from 40 to 100 feet after striking the children.  The pilot threw them from the track, not seriously hurting the other child, but fatally injuring deceased.  That the engineer acted promptly after seeing the children, did everything possible to meet the emergency, and made a good stop, is not seriously questioned.  The complaint is that he should have seen them sooner.

At the close of the testimony a motion for a directed verdict in favor of defendant was granted, for the reason that no *prima facie* case of actionable negligence on the part of defendant was shown; that plaintiff's contention that the engineer could and should have seen the children's perilous condition sooner was

only based upon and supported by certain claimed inferences from measurements, against positive testimony of eyewitnesses to the accident, and a verdict of negligence on the part of the engineer, if returned, would be so against the weight of evidence that it would be the duty of the court to set it aside; and for the further reason that it was not the duty of defendant to watch for trespassers within its yard limits. It was shown that defendant's yard limits, as established and used, extended beyond the place of accident, and the right of way was not then fenced at that point.

A motion by plaintiff for a new trial was denied. Aside from alleged errors in rulings during the trial and in directing a verdict, the ground of newly discovered evidence was also urged, based upon an affidavit of a woman living near by to the effect that from her window she saw the children upon the alley slowly approaching the track, and last noticed them when they were several feet south of a cinder path south of the track; that between a half minute and one minute later she heard the sound of brakes stopping the train, and, looking again, saw the two children had been thrown to the south side of the track, lying on the ground on or near the cinder path, and the engine stopped some distance beyond. Her house was situated 25 feet above the level of the track, and she also testified as to both her opportunities of observation and those of the engineer on a train approaching from the west. On denying this motion the court said:

"The newly discovered evidence as shown by the affidavit of Mrs. Davis would not change the result or add anything to plaintiff's case."

This witness was a near neighbor of plaintiff, and continued to live there until the time of the trial. With reasonable diligence her evidence could have been discovered and then produced. She did not see the accident or the children upon the track. Her testimony

was in its nature cumulative upon plaintiff's contention that the engineer should have seen them sooner, and, as bearing upon whether a verdict should have been directed, not such as to call for a different ruling. The showing upon the claim of newly discovered evidence was not such as to demand a new trial.. *Raymond* v. *Day*, 111 Mich. 443 (69 N. W. 832) ; *Canfield* v. *City of Jackson*, 112 Mich. 120 (70 N. W. 444).

Plaintiff's counsel group their assignments of error, for argument, into the following propositions, interrogatively stated:

"(1) Was there any obligation of care on the part of defendant in keeping a lookout for children on the track at the place deceased was injured?

"(2) Was there error in excluding evidence that the maintaining of fences along the line of the right of way at this point would not interfere with railroad operations?

"(3) Was there on the trial or in the affidavit supporting the motion for a new trial evidence of negligence of the engineer in failing to keep a proper lookout in approaching the place where the injury occurred?"

The first and third queries blend in argument and together involve the important and controlling question of whether a verdict for defendant was rightly directed.

As to the second, we do not discover from the record that defendant contends fencing along the right of way would seriously interfere with railroad operations. On the contrary, it was shown that some years before the accident defendant had built fences along both sides of the right of way past the park and erected warning notices to prevent persons from trespassing upon the tracks in crossing to and from the park, but that these were repeatedly broken down and ignored by those who persisted in crossing there, until they had virtually disappeared, and the section foreman

gave up trying to maintain them, though he continued to warn away trespassers and drive away children whenever he saw them upon the right of way. It was shown, and not disputed, that nevertheless both adults and children did frequently cross the tracks in that locality as a convenient way to the park, and in doing so had made paths. There is no proof of affirmative permission or invitation, but it is shown that those found crossing were frequently warned away, and defendant contends it was unable to prevent this trespassing unless it constantly stationed guards there, which it was under no obligation to do.

It is well settled that railroads are not required to fence their yard limits, and a failure to do so is not evidence of negligence. *Rabidon* v. *Railway Co.*, 115 Mich. 390 (73 N. W. 386, 39 L. R. A. 405) ; *Burtram* v. *Railroad Co.*, 148 Mich. 166 (111 N. W. 749). The circumstances of this case show no express or implied invitation from defendant to cross its tracks at that point. The most that can be claimed is lack of constant vigilance to prevent, and that it suffered or tolerated such use.

"The status of a trespasser in going upon railroad tracks at a place other than a public crossing, without express or implied permission, will not ordinarily be affected by the fact that he or others of the public have been accustomed to walk upon or cross the tracks at that place, especially where repeated protests and warning against such use have been given. Nor, as a general rule, is the mere fact that the railroad company does not object or passively acquiesces in such custom sufficient to constitute such a person more than a trespasser, or at most a mere licensee." 33 Cyc. p. 758.

The question of whether persons of accountability crossing the track at that point were in law trespassers or mere licensees by implication is, however, of little importance here, for it would be strangely

incongruous to give significance as the acts of a licensee to the conduct of a child *non sui juris*, possessing no more understanding of boundary lines and property rights than a stray animal and less able to understand and protect itself from danger.

There can be no presumption from an implied license to the public to cross private property that helpless infants, too young to understand danger, will be permitted by those responsible for them to wander, when regular trains are passing, unattended along or upon a railroad track; and, on the other hand, the law recognizes that such infants are unaccountable, because unconscious of the nature of their acts, with no appreciation of attending danger to themselves or others, and therefore cannot be charged with contributory negligence nor held as wilful trespassers to an extent which precludes redress for injury resulting from the reckless or negligent acts of others. *Battishill* v. *Humphreys,* 64 Mich. 494 (31 N. W. 894); *Huggett* v. *Erb,* 182 Mich. 524 (148 N. W. 805). The latter case lays down no new doctrine and changes no previous rule, but, as applied to the case then under consideration, reiterates and points out the distinction, relating to trespass, involving danger of injury, between infants *non sui juris* and adults or those of sufficient age to realize the nature of their conduct, care for themselves, and be accountable for their acts. In that case two small children in the city of Alma were playing along and walking down the track ahead of an approaching train, which struck and seriously injured one of them, unnoticed by the engineer or fireman, who first learned of the accident when they arrived at the next station. These children, not simply crossing the track, but walking along it, were not seen by the engineer at all. Although plaintiff's evidence tended to show that the children, seen by others who sought from some distance to signal the train and reach them ahead of it,

were upon the track in plain sight of those upon the engine long enough to have been seen by them in abundant time to easily stop and avoid the accident had any lookout been maintained. It was there urged that, irrespective of such evidence, a verdict should be directed for defendant because the children were, in fact, not seen by the engineer or fireman and were trespassers upon the right of way, to whom defendant owed no duty but to avoid injuring them if and when seen, apparently in disregard of the duty to keep a reasonably vigilant lookout according to environments and of the distinction there discussed under which the law does not necessarily bar such infants as accountable trespassers from redress for personal injuries resulting through the negligence of others. The gist of the distinction is that such infant must be recognized as legally unaccountable and itself free from blame.

Back of that lies the rule that at places where there is reason to anticipate that persons, including children, may be upon the track, as in cities and towns, the train cannot be operated upon the presumption that the track is clear and need not be watched, but a proper lookout must be maintained with that degree of care which a person of ordinary prudence and caution, having in mind both the safety of the train with its passengers and persons ahead likely to be injured by it, would commonly exercise under like circumstances, according to the probability of danger at the portion of the track being traversed.

The duty of strangers to children was early discussed, and the rule clearly stated, in *Hargreaves* v. *Deacon*, 25 Mich. 1, where it is said:

"We feel, usually, more indignation at wrongs done to children than at wrongs done to others. But the law has not usually given them civil remedies on any such basis. Nor does it usually, if ever, impose any duties on strangers towards them, resting entirely on the fact that they are children. Those who have any

special dealings with them, as parents, teachers, and employers, incur obligations appropriate to their relations, and differing from those incurred towards others in proportion to the necessity of care and protection and the risk of injury. But those who have no such relations with them are not liable for negligence in carrying on their own business, beyond what would be their liability to others, as well as children, who are equally free from blame."

In the *Huggett Case* and *Green* v. *Railway Co.,* 110 Mich. 648 (68 N. W. 988), cited by plaintiff as analogous in facts and supporting his contentions, being cases in which children of near the same age as deceased wandered upon tracks and were struck by passing trains, the controlling reason for holding them cases for a jury was that the records contained testimony showing no lookout was maintained; that the children, plainly in sight upon the track, were not seen at all by any of the train crew before the accident, and no attempt was made to avoid injuring them, while here a watch along the track was kept by the engineer, who did see the children and made every effort to avoid injuring them as soon as they were seen. The only question here is whether there is any competent testimony in the case tending to show negligence in his not being more vigilant and prompt. The same distinction appears in *Tutt* v. *Railway Co.,* 104 Fed. 741 (44 C. C. A. 320), resembling in certain particulars this case, and relied upon by plaintiff. It was there held under plaintiff's testimony that the question of implied license was an issue for the jury; that "persons availing themselves of such implied license would not be trespassers, and the railroad company would come under a duty in respect to such licensees to exercise reasonable care in movement of its trains at points where it was bound to anticipate their presence"; and that it might properly be left to the jury to determine whether such management was negligent

in a case where plaintiff's testimony showed that the 14 approaching cars were being pushed along the track with no brakeman upon them, that no warnings were given, and that no means were taken to avoid collision with persons who might be expected to be found upon the track; in other words, it was a case for the jury, because there was evidence that no lookout was maintained and no warning was given of the approaching train. In the instant case it is conclusively shown that these things were done. This was a regular passenger train, leaving the city on time, at a lawful rate of speed, properly equipped, the engineer in his seat where his duties assigned him, in charge of and running his engine, maintaining a lookout along the track ahead. A warning signal was sounded as the train came around the curve at the bridge, and the bell was ringing.

Conceding this was a place where the presence of persons on the track was to be anticipated, no one was there when the train came in sight around the curve at the bridge. No person saw these children upon the track until the train was close to them, and the evidence of those who saw them is that they were not. The engineer, whose duty it was to see, and who testifies he was watching, estimates the distance at which they came upon the track ahead of the train at 150 to 200 feet. Welch, the foreman of that section, who came in from the east with his hand-car and pulled it off the track at Grand avenue as he saw the train coming around the curve at the bridge, testifies:

"When I first saw the train up beyond the bridge I did not see any children. I looked on the track, and did not see a soul on the track. * * * I could see between me and the train. There was nobody on the track. Then I turned immediately to my car and put it off. I did not see where these children came from. When I first saw them the train was just hitting them."

After putting his car off his attention was directed to some sewer work passing under the track, and he did not look towards the train again until he heard some one shout, and turned just in time to see the accident.

The two other witnesses who saw the accident were a Mr. Boyes, a contractor who was putting in a sewer at Grand avenue which ran under the track, and his foreman, named Rens. When the train approached Boyes was some 60 feet away from the track, and from where he then stood some bushes obscured his view of the approaching train. His men were working at the sewer where it passed under the track, and he was watching for the train to notify them, if necessary. He testified in part:

"I had made several observations to the west to see about the train coming or hearing it. I had not at any time seen these children on the track, except immediately before the collision took place. When I first saw the children on the track I started to run and holler. I would not go over 8 or 10 feet until I could see College avenue, just to get through the evergreen trees. I saw the train just after I had made a few steps. It would be pretty hard for me to tell how close to the children the train was when I started to run, but it could not have been a great ways because it all happened in a few seconds. * * * Well, I don't think the engine would be more than 200 feet from the children when I saw them."

Rens stood on the track over the sewer and notified the men when he heard the train coming. He states he looked up to see the train, and saw no one on or near the track, heard the whistle and watched the train approach, then noticed some one go up the small embankment, and, as they got high enough so he could see, discovered it was two little children. He estimated the engine "would be probably 150 feet west of them when these little children stepped upon the track," and that it ran about 60 feet after it struck them. He also states:

"The children were just about at the ties at the time I first discovered them. * * * I saw this train all of the time after it left the bridge approximately until it struck the children. I did not see the children until they were stepping on these ties."

While it is contended that modifying statements of these witnesses as to means of observation, seconds of time, and distances in feet raise opportunity for inference that the engineer could have seen them sooner and could have stopped quicker, we conclude from a careful reading of this record that there is no testimony which tends to negative their testimony that these children suddenly appeared upon the track and in view when the engine was within not over 200 feet of them and too near for the train to be stopped before reaching them; that this accident resulted from a sudden and unanticipated act of the child itself, was not to be anticipated, could not be foreseen, and therefore in the reasonable conduct of defendant's business could not be guarded against. In such case there is no liability. *Coessens* v. *Rapid Railway*, 136 Mich. 481 (99 N. W. 751).

The judgment is affirmed.

BROOKE, C. J., and KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.

The late Justice McALVAY took no part in this decision.